IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

M.S, a minor, by and through his parents      NO. 1:08-CV-2271
   and natural guardians
MICHELLE M.S.
D.S.

                                    JUDGE CONNER

v.

CEDAR BRIDGE MILITARY ACADEMY     MAGISTRATE JUDGE METHVIN
STEVEN T. BARYLA
YORK-ADAMS COUNCIL BOY SCOUTS
   OF AMERICA

REPORT AND RECOMMENDATION
ON MOTION FOR SUMMARY JUDGMENT
(Doc. 71)

Plaintiff, M.S., is a minor appearing here through his parents. All three are

residents of Connecticut. Plaintiff alleges he suffered verbal and physical abuse

while attending a summer camp in 2007 run by the Cedar Bridge Military

Academy, a private, non-profit organization which is now defunct. By virtue of a

lease, Cedar Bridge's camp was located on a portion of Camp Tuckahoe in York

County, Pennsylvania, a camp which was owned and otherwise operated by the

York-Adams Area Council, Inc. ("York-Adams Boy Scouts").

Plaintiff filed a complaint on December 19, 2008 (Doc. 1) and thereafter

filed an amended complaint on January 20, 2010. (Doc. 32). Named as defendants

are Cedar Bridge Military Academy; Steven T. Baryla, co-founder and director of

2

Cedar Bridge's summer camp; and the York-Adams Boy Scouts.[1]  This court has

jurisdiction pursuant to 28 U.S.C. §1332.

The sole claims in dispute are those asserted against the York-Adams Boy

Scouts.[2]  Plaintiff contends that:

> 1) as landlords in possession of the property, the York-Adams Boy
> Scouts knew or should have known of the harmful conduct
> perpetrated by Cedar Bridge and Baryla against the minor plaintiff,
> and were negligent "in failing to deter, prevent, stop or otherwise
> monitor, review or evaluate the actions of Defendants Cedar Bridge
> and Baryla which resulted in the harm as aforementioned to minor
> plaintiff."
>
> 2) The York-Adams Boy Scouts were negligent in failing to insure
> that Cedar Bridge and Baryla were covered by a policy of liability
> insurance for the relevant camping season, as required in the Letter
> Agreement.

(Amended Complaint, Doc. 32, ¶¶ 49-53).

---

[1] The amended complaint also named Boy Scouts of America as a defendant, but it was
dismissed by stipulation of the parties. (Doc. 51).

[2]  Plaintiff's claims against Cedar Bridge and Baryla include failure to properly hire,
supervise, and retain properly trained counselors and employees; negligent entrustment;
and intentional infliction of emotional distress. (Doc. 32, ¶ 10).

3

Before the court is the York-Adams Boy Scouts's motion for summary judgment.[3] The motion has been referred to the undersigned for a report and recommendation, and is now ripe for disposition.

## ISSUES PRESENTED

York-Adams Boy Scouts advances the following arguments in favor of summary judgment:

1.  As a factual matter, it had no reason to suspect that the acts alleged by plaintiff were being committed, and thus had no duty as the possessor of land to warn or protect against tortious acts of third persons against its invitee.

2.  With respect to the issue of liability insurance, Pennsylvania law does not recognize a duty of a landlord to a tenant's invitees to ensure the tenant maintains liability insurance.

## FINDINGS AND RECOMMENDATIONS

### I. Background

The facts, viewed in a light most favorable to plaintiff as the non-mover, reveal the following factual background:

---

[3]  York-Adams Boy Scout Council filed a motion for summary judgment and supporting brief on September 13, 2011 (Docs. 71, 72). A statement of material facts is included as part of the motion itself. (*See* Doc. 71). Plaintiffs filed a response to the motion along with a brief in opposition on October 4, 2011 (Docs. 73, 74), to which the York-Adams Boys Scout Council filed a reply brief on October 13, 2011. (Doc. 75).

4

Cedar Bridge was an "after-school youth program" whose stated aim was to develop leadership, character, and an understanding of the military's role in society. (Doc. 71, 73 ¶ 24). It was founded in 2003 by Baryla and his then-fiancee, Danielle Berndt. (*Id*. at ¶ 25).

Cedar Bridge leased space at Camp Tuckahoe for summer camp from 2005–2008. (Docs. 71, 73 ¶ 7). In 2005, the program lasted three weeks. In 2006 and 2007, the camp was scheduled for four weeks.[4]

Four days before the camp was to begin in 2005, Baryla contacted Camp Tuckahoe about Cedar Bridge's use of its facilities for 85 students and 20 instructors. (*Id*. at ¶ 37; Doc. 73 at p. 62 (Baryla Dep. 38:3-7). Todd A. Weidner was the summer camp director of Camp Tuckahoe for the York-Adams Boy Scouts, and responsible for its day-to-day operations (Doc. 71, ¶¶ 35, 36). After a phone conversation, Weidner approved Cedar Bridge's use of the camp. (Doc. 73, ¶ 37). Weidner did not meet Baryla or Berndt until they and the rest of the Cedar Bridge staff arrived at Camp Tuckahoe for the start of camp. (*Id*.). The lease agreement was signed at that time. (*Id.*) Weidner did not ask Baryla about any criminal convictions or his military background. (Doc. 73, ¶ 37; Doc. 73 at p. 107, Baryla Dep. 196:8-18). Baryla had been charged in May 2004 with entering

---

[4] Cedar Bridge cancelled the last week of camp in 2006.

5

government facilities by false pretense and, at the time of the interview with

Weidner, was serving a sentence of 18-months probation. (Doc. 73 at pp. 58-60,

(Baryla Dep. 31:18 - 33:9).[5]

In a "Letter of Agreement Establishing Camp Use" signed December 12,

2006, Cedar Bridge leased a portion of Camp Tuckahoe for the period of July 7

through August 3, 2007. (*Id*. at ¶¶ 9-10). The Agreement required Cedar Bridge to

provide the York-Adams Boy Scouts with a valid certificate of liability insurance

listing the York-Adams Boy Scouts as an additional insured. Cedar Bridge

provided an insurance certificate at the time the agreement was signed, but it

expired in March 2007, before camp began. The York-Adams Boy Scouts never

requested a new certificate, nor was one provided. (*Id*. at ¶¶ 11-12). Baryla

testified he did not realize the certificate of insurance had expired before the 2007

summer camp period, claiming he had always relied on Berndt to update the

insurance, and she left the camp program in 2006. (*Id*. at ¶¶ 13, 14).

The Letter of Agreement also required Cedar Bridge to execute a hold

harmless agreement in favor of the York-Adams Boy Scouts. (*Id*. at ¶ 15). A Hold

Harmless Agreement was executed on December 12, 2006, but the document

---

[5] In 2009, Baryla was indicted by a federal grand jury for transportation of child
pornography, to which he pled guilty and for which, in 2011, he was sentenced to six
years incarceration.

stated that the period covered was from July 9, 2006 through July 29, 2006. No reference was made to the 2007 camp term. (*Id.* at ¶ 17).

Several incidents occurred at the Cedar Bridge summer camp at Camp Tuckahoe prior to 2007 that warrant consideration. Berndt, a Cedar Bridge co-founder and staff member, testified:

> A.    . . . I think it's a fine line between the military discipline that parents sign their students up for, and being verbally abusive, and I felt sometimes he [Baryla] went overboard and crossed that line. The only incident that I can specifically recall that I actually took him aside and told him he would never, ever do it again, or I would be leaving, I don't remember what summer it was. I think it might have been the summer of 2006, but there was a student standing in line I believe to go into like the cafeteria for lunch, and he actually physically pushed him, and when I saw that, I told him that he could not do that.

(Doc 73, p. 221 (Berndt deposition p. 24:7–19)).

Jeanette Holbrook[6] testified that she observed Cedar Bridge staff cursing at one another and using foul language in front of students. (*Id*. at p. 185 (deposition p. 35:17–19)). She also witnessed an altercation between Baryla and another Cedar Bridge staff member. (*Id*. at p. 191 (deposition p. 54:3–5)).

During the summer of 2006, Berndt was caught having sexual intercourse with another Cedar Bridge instructor on a picnic table in the Boy Scouts' section

---

[6] Jeanette Holbrook appears to be the wife of Scott Holbrook, York-Adams Boy Scouts's ranger at Camp Tuckahoe, and the medic for Camp Tuckahoe. (Docs. 173, p. 205).

of Camp Tuckahoe. (Doc. 73, ¶ 53 (d)). Baryla, who was engaged to Berndt at the time, became distraught, emotionally upset, was crying, tried to break a window and yelled at Berndt in front of the students. (*Id*. at ¶ 55). Cedar Bridge staff asked Baryla to leave camp, which he did, only to return later. (Docs, 71, 73 ¶ 56). Cedar Bridge staff then called police and Baryla was arrested, an act authorized by Weidner. (*Id*. at ¶ 59). Despite Baryla's emotional state, Weidner testified that he was not concerned about Baryla's ability to run the camp and that he did not believe Baryla was unstable. (*Id*. at ¶¶ 66- 67). After this incident, a Cedar Bridge staff member took parts of Baryla's vehicle to the shooting range to shoot them up. (Doc. 73, p. 83–84 (Baryla Dep. 68:24–69:22)).

Weidner testified that in 2006, Cedar Bridge activities had been "very visible" because the Boy Scouts provided food service to Cedar Bridge that summer. However, due to various incidents in 2006, Cedar Bridge activities were moved to a different area of the park and Cedar Bridge staff picked up their own food. (Doc. 73, ¶ 49). Although Cedar Bridge had a designated area within Camp Tuckahoe for its use, it also used various other facilities at Camp Tuckahoe, including the pool and shooting range. (Doc. 73, ¶ 76 (Weidner's deposition at 40, Doc. 73, p. 122)). Aside from rangers checking on maintenance issues such as garbage collection, staff at York-Adams Boy Scouts was forbidden to enter Cedar

8

Bridge's portion of Camp Tuckahoe in 2007. (Doc. 73, ¶ 49). Weidner instituted a

policy whereby Cedar Bridge and the Boy Scouts were in different areas and were

not to act or interfere with one another. (Doc. 73, ¶ 73). The Boy Scouts did not

directly supervise Cedar Bridge activities. (Docs. 71, 73 ¶ 77).

Scott Holbrook, Camp Tuckahoe's ranger in 2006 and 2007, testified that he

was responsible for maintenance and security at Camp Tuckahoe. (*Id*. at ¶ 79). In

2007, Holbrook came into contact with Cedar Bridge, specifically Baryla, three to

four times per day in checking the facilities and collecting the garbage. (*Id*. at

¶ 81). Holbrook testified that he never witnessed abusive conduct towards Cedar

Bridge students, nor heard stories of such conduct. (*Id*. at ¶¶ 82, 83). Weidner also

claimed to be unaware of abusive conduct towards the Cedar Bridge students, and

that he had not heard of the incidents alleged in the complaint. (*Id*. at ¶¶ 84, 85).

M.S. attended the Cedar Bridge camp in 2007. (*Id*. at ¶ 8). M.S. testified that

on the first day of camp, he vomited and Cedar Bridge staff forced him to sit in it

and then eat his own vomit. (Doc. 73, p. 158 (M.S. Dep. 158:9-16)). He testified

that at later times during the session, Baryla and other Cedar Bridge staff would

make him eat bowl after bowl of macaroni until he vomited, and then make him

eat more. (Doc. 73, ¶ 99). He testified that Baryla and a member of the youth staff

9

told sexually explicit stories, and that Baryla once physically grabbed him and threw him. (*Id*. at ¶ 112; *see also* M.S. Dep., Doc 73 at pp. 158, 166).

In his deposition, Baryla denied the claims of abuse made by M.S.  Baryla testified that punishment for disobeying orders included push-ups, jumping jacks and things like that, and "a certain amount of . . . abuse is necessary for the training[.]" (Docs. 71, 73 ¶¶ 44, 114).

Berndt and Jeanette Holbrook testified that verbal and/or physical abuse did occur at Cedar Brook. (Doc. 73, ¶ 114). M.S. further testified that on one occasion when Cedar Bridge students were being cursed at by Cedar Bridge staff using the "F-word," Baryla identified someone present as being with the York-Adams Boy Scouts. (Doc. 73 at ¶ 119; *Id*., at p. 163 (M.S. Dep., 79:5-24).

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

10

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). A dispute of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine dispute of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid or obtain summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed. R. Civ. P. 56(c)(1); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (requiring evidentiary support for factual assertions made in response to summary

judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed. R. Civ. P. 56(e).

## III. Discussion

Both issues raised by York-Adams Boy Scouts require an examination of the applicable standard of negligence. "[A] federal court must apply the substantive laws of its forum state in diversity actions," such as this one. *Lafferty v. St. Riel*, 495 F.3d 72, 76 (3d Cir. 2007). Therefore, Pennsylvania law applies to this dispute. Under Pennsylvania law, "[t]he mere occurrence of an accident does not establish negligent conduct." *Martin v. Evans*, 711 A.2d 458, 461 (Pa.1998). Rather, "[i]n any case sounding in negligence, a plaintiff must demonstrate: (1) a

duty of care; (2) the breach of the duty; (3) a causal connection between the

conduct and the resulting injury; and (4) actual loss or damage resulting to the

plaintiff." *Farabaugh v. Pa. Turnpike Com'n*, 911 A.2d 1264, 1272-73 (Pa. 2006).

    A.    *Duty to warn or protect by a possessor of land: did York-Adams Boy Scouts have reason to believe alleged acts were being committed?*

York-Adams Boy Scouts contends that it had no reason to suspect that the

acts alleged by plaintiff were being committed, and therefore it had no duty as the

possessor of land to warn or protect against tortious acts of third persons against

its invitee.  Plaintiffs' argue, however, that York-Adams Boy Scouts and its agents

were aware or should have been aware of prior acts by Cedar Bridge and Baryla

that would give rise to a duty to inspect, warn and/or protect students such as M.S.

from future acts.

As is evident from the factual background stated above, viewed in the light

most favorable to plaintiff, there are genuine disputes of material fact as to what

Weidner and other members of the York-Adams Boy Scouts saw, heard, and

learned about the operations of Cedar Bridge prior to the time of the events

alleged by plaintiff in the summer of 2007. There is also sufficient evidence of

record to allow a reasonable jury to find that Weidner and/or others in positions of

responsibility at York-Adams Boy Scouts failed to conduct a proper "due

diligence" assessment of Cedar Bridge's operations before allowing them to bring students onto York-Adams' property.

A review of the applicable law establishes that the factual disputes are indeed material. Pennsylvania courts have adopted the Second Restatement approach to determining the duty owed by a possessor of land to a person on his land. *See Kirschbaum v. WRGSB Assocs.*, 243 F.3d 145, 152 (3d Cir.2001) (citing *Carrender v. Fitterer*, 503 Pa. 178, 469 A.2d 120, 123 (1983)). Section 344 of the Restatement (Second) of Torts provides:

> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
>
> > (a) discover that such acts are being done or are likely to be done, or
> >
> > (b) give warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

RESTATEMENT (SECOND) OF TORTS § 344 (1965). Section 344 requires a landowner to "take reasonable precautions against harmful third party conduct that might be reasonably anticipated." *Rabutino v. Freedom State Realty Co.*, 809 A.2d 933, 939 (Pa. Super. Ct.2002). This provision has been applied to warning or prevention of criminal acts as well as negligent acts of third parties—including

14

independent contractors and patrons — of which a business owner is aware.[7]

*Donovan v. Strawbridge & Clothier*, No. 2985, 1994 WL 1251144. *6 (Pa. Com.

Pl. June 24, 1994. Under this approach, "the duty of a possessor of land toward a

third party entering the land depends upon whether the entrant is a trespasser,

licensee, or invitee." *Cresswell v. End*, 831 A.2d 673, 675 (Pa. Super. Ct. 2003).

An "invitee" includes "a person who is invited to enter or remain on land for a

purpose directly or indirectly connected with business dealings with the possessor

of the land." *Id.* at 675-76 (*quoting* Restatement (Second) of Torts § 332 (1965)).

There is no dispute that M.S. and the other students at Cedar Bridge were

invitees on land owned by York-Adams Boy Scouts. Neither is there any dispute

that York-Adams Boy Scouts and Cedar Bridge were conducting operations at

Camp Tuckahoe at the same time during the relevant periods in question.

Accordingly, York-Adams was not merely owner of the property, it also exercised

possession and control, and therefore cannot be considered a landlord "out of

possession" with no duty for injuries incurred by third parties on its leased

premises. *See, e.g., Dorsey v. Continental Associates*, 404 Pa. Super. 525, 591

A.2d 716, 718 (Pa. Super. Ct. 1991); *Kobylinski v. Hipps*, 359 Pa. Super. 549, 519

---

[7] "Restatement (Second) of Torts § 344 and its comment (f) have long been the law of Pennsylvania." *Donovan v. Strawbridge & Clothier*, No. 2985, 1994 WL 1251144 at 5 (Pa. Com. Pl. June 24, 1994) (citations omitted).

15

A.2d 488, 491 (Pa. Super. Ct. 1986); *Henze v. Texaco, Inc.*, 352 Pa. Super. 538, 508 A.2d 1200, 1202 (Pa. Super. Ct. 1986) (citing, *inter alia*, RESTATEMENT (SECOND) OF TORTS § 356 (1965)). Liability attaches if a landlord has "retained control over a portion of the property which is necessary to the safe use of the leased property." *Kobylinski*, 519 A.2d at 491.

Comment (f) of section 344 provides that while a possessor of land is not an insurer of his patrons, "[i]f the place or character of his business, or his past experience, is such that he should reasonably anticipate careless ... conduct on the part of third persons,[8] either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection." Restatement (Second) Torts § 344 cmt. f (1965).[9] Thus, in determining the applicability of §344, courts examine

---

[8] Comment (b) to Section 344 provides:

'Third persons' include all persons other than the possessor of the land, or his servants acting within the scope of their employment. It includes such servants when they are acting outside of the scope of their employment, as well as other invitees or licensees upon the premises, and also trespassers on the land, and even persons outside of the land whose acts endanger the safety of the visitor.

[9] Comment (f) states:

(f) Duty to police premises. Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may,

(continued...)

16

whether (1) the "place or character" of the defendant's business is inherently

dangerous or (2) defendant's "past experience" is such that the danger that resulted

in plaintiff's injury should have been foreseen. *See Valerio v. Keystone Turf Club

Inc.*, No. 2823, 1999 WL 1258938, at 2 (Pa. Ct. Comm. Pl., March 17, 1999);

Restatement (Second) of Torts § 344 cmt. f (1965). *See also Murphy v. Penn Fruit

Company*, 274 Pa. Super. 427, 418 A.2d 480 (Pa. Super. Ct. 1980) (applying § 344

because the defendant had prior notice of crimes occurring behind its parking lot

and failed to protect or warn the plaintiff, who was stabbed there); *Moran v. Valley

Forge Drive-in Theater Inc.*, 431 Pa. 432, 246 A.2d 875 (Pa.1968) (finding that §

344 applied because the defendants had notice of prior acts potentially harmful to

patrons committed by third persons in the area where plaintiff was injured); *Glass

v. Freeman*, 430 Pa. 21, 240 A.2d 825, 830 (Pa.1968) (applying § 344 where,

because of the dangerous character of construction sites, it was foreseeable that an

unsupervised child would cause injury).

---

[9](...continued)
however, know or have reason to know, from past experience that there is a likelihood of
conduct on the part of the third persons in general which is likely to endanger the safety
of the visitor, even though he had no reason to expect it on the part of any particular
individual. If the place or character of his business, or his past experience is such that he
should reasonably anticipate a careless or criminal conduct on the part of a third person,
either generally or at some particular time, he may be under a duty to take precautions
against it, and to provide a reasonably sufficient number of servants to afford a reasonable
protection.

17

To establish liability under § 344, a plaintiff must satisfy three elements: "(1) that plaintiff was injured by the kind of acts described in the section; (2) that such acts were being done, or were likely to be done; and (3) that the defendant failed in one of two duties—either to take reasonable care to discover that such acts were being done or were likely to be done, or to take reasonable care to provide appropriate precautions." *Moultrey v. The Great A & P Tea Co.*, 281 Pa. Super. 525, 422 A.2d 593, 598 (Pa. Super. Ct.1980); *see Vazquez v. Wal-Mart Stores, Inc.*, No. 09-2609, 2010 WL 3191852, *4 (E.D. Pa. Aug. 5, 2010) ("To establish liability under [Section] 344, plaintiff must prove that [defendant] either (1) helped create the dangerous condition, or (2) had actual or constructive notice of the condition."). Section 344 requires that "reasonable measures be taken to control the conduct of third persons, or to give adequate warning to enable patrons to avoid possible harm." *Moran*, 246 A.2d at 879. Unlike section 343, which holds that a defendant need only have knowledge of the *likelihood* of a harmful condition caused by a third party, section 344 requires knowledge of the actual harmful condition. *Read v. Sam's Club*, No.: 2-05-CV-00170-LLD, 2005 WL 2346112 (E.D. Pa. Sept. 23, 2005). Thus, some reoccurring conditions caused by third parties may constitute notice to the possessor of land under section 344. *Id.*; *see also* Restatement (Second) of Torts § 344 cmt. f.

18

Plaintiffs contend that several incidents which occurred prior to 2007 should have put York-Adams Boy Scouts on notice of the potential for harm to invitees by Cedar Bridge and/or Baryla. Berndt testified that she saw Baryla push another student, that Baryla was verbally abusive and that he sometimes crossed the line. Jeanette Holbrook observed Cedar Bridge staff curse at each other as well as students. Baryla was arrested after a fight with Berndt in front of the students. Weidner authorized the arrest to remove Baryla from the camp. Additionally, it is alleged that a Cedar Bridge staff member pushed Baryla up against a building, a result of which was the staff member's eviction from camp.[10]

Aside from one incident of verbal abuse, York-Adams Boy Scouts contends that it had no knowledge of these events. However, a review of the depositions in the case raises genuine issues of material fact as to what Weidner actually knew or should have known based upon the many events and long period of interaction leading up to the summer of 2007.

A jury question is created where the evidence demonstrates that the defendant "had notice, either actual or constructive, of prior acts committed by a

---

[10] The abuse which M.S. avers he suffered, *to wit.*, being forced to eat his own vomit, being told sexually explicit stories and being grabbed and thrown by Baryla, will not be considered as "past experience." Nonetheless, it would appear relevant if it occurred in the presence of York-Adams Boy Scouts staff and such persons failed to stop it.

third person within their premises, which might cause injuries to patrons." *Ross v. Sunoco Inc.*, 56 Pa. D. & C. 4th 358, 364 (Pa. Com. Pl. 2002) (citing *Moran*, 431 Pa. 432, 246 A.2d 875). It also is the function of the jury to determine whether "adequate measures were taken to control the conduct of third persons." *Id.*; *see also Bloom v. Dubois Regional Medical Center*, 409 Pa. Super. 83, 597 A.2d 671, 680–81 (Pa. Super. Ct. 1991) ("[W]hether an act or failure to act constitutes negligence, of any degree ... has always been particularly committed to determination by a jury."). The issue of whether a defendant breached any duty may be removed from the jury only "when the case is free from doubt and there is no possibility that a reasonable jury could find negligence." *Emerich v. Philadelphia Center for Human Development, Inc.*, 554 Pa. 209, 720 A.2d 1032, 1044 (Pa.1998); *see also Bloom, supra* at 681.

As noted above, Weidner, Scott Holbrook and Jeanette Holbrook were aware of questionable behavior on the part of Baryla and other Cedar Bridge staff members that may, arguably, be construed as alarming enough to put the York-Adams Boy Scouts on notice of the actions occurring at the Cedar Bridge camp and, specifically, to M.S. York-Adams staff testified that they were aware of outbursts, altercations, and verbal abuse. Plaintiffs have demonstrated, therefore, that there is evidence to support a duty to warn or protect under §344 of the

20

Restatement. Whether the inaction of the York-Adams Boy Scouts constitutes negligence is to be determined by the fact-finder. Consequently, summary judgment is not warranted on this issue.

B.   *Did York-Adams Boy Scouts have a duty to ensure that its tenant maintained liability insurance?*

There is no dispute that Cedar Bridge did not obtain liability insurance coverage naming York-Adams Boy Scouts as an additional insured, as required by the Letter Agreement applicable to the 2007 camp session. York-Adams Boy Scouts contends, however, that Pennsylvania law does not recognize a duty of a landlord to a tenant's invitees to ensure the tenant maintains liability insurance. M.S. argues that third-party beneficiary status may be conferred, despite a lack of express intent, when circumstance compel the recognition of a beneficiary's right to effectuate the intent of the parties.

Pennsylvania has adopted the Restatement (Second) of Contracts § 302 (1981) for determining third-party-beneficiary status. In *Scarpitti v. Weborg*, 530 Pa. 366, 609 A.2d 147 (1992), the Pennsylvania Supreme Court summarized Pennsylvania third-party-beneficiary law as follows:

> [A] party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, *Spires, supra,* unless the circumstances are so compelling that recognition of the beneficiary's right is appropriate to

> effectuate the intention of the parties, and the performance satisfies an
> obligation of the promisee to pay money to the beneficiary or the
> circumstances indicate that the promisee intends to give the
> beneficiary the benefit of the promised performance. *Guy v.
> Liederbach*, 501 Pa. 47, 459 A.2d 744 (1983).

*Id*. at 372-73, 609 A.2d at 150-51.

There are two tests for third-party-beneficiary status. The first one requires

that the parties to the agreement indicate in the agreement itself that the purported

beneficiary is a third-party beneficiary. *Sovereign Bank v. BJ's Wholesale Club,

Inc.*, 395 F. Supp.2d 183, 199 (M.D. Pa. 2005). The second test does not require

an affirmative recognition of the purported beneficiary in the contract itself but

imposes two requirements. *Id*. First, the circumstances must be so compelling that

recognition of the beneficiary's right is appropriate to effectuate the intention of

the parties. *Id*. Second, it must be shown either that the performance satisfies an

obligation of the promisee to pay money to the beneficiary or that the

circumstances indicate that the promisee intends to give the beneficiary the benefit

of the promised performance. *Id*. In elaborating on the second test, the

Pennsylvania Supreme Court observed:

> The first part of the test sets forth a standing requirement which
> leaves discretion with the court to determine whether recognition of
> third party beneficiary status would be appropriate. The second part
> defines the two types of claimants who may be intended as third party

beneficiaries. If a party satisfies both parts of the test, a claim may be
asserted under the contract.

*Id*. (quoting *Scarpitti, supra*, 530 Pa. at 371, 609 A.2d at 150).

Because the parties to the agreement have not indicated that students such
as M.S. are intended beneficiaries to their agreement, M.S. must proceed under the
second test. Thus, they must establish compelling circumstances such that the
recognition of their right is appropriate. This they have not done, nor is such a
conclusion necessary to effect the intent of the parties. Additionally, with respect
to the second element, there is nothing in the Letter of Agreement that suggests an
obligation of the York-Adams Boy Scouts to pay a camper such as M.S.  York-
Adams Boy Scouts correctly note that it is the only beneficiary of the
indemnification language. Moreover, the circumstances do not indicate that the
York-Adams Boy Scouts intended to give students such as M.S. the benefit of the
promised performance, *to wit.,* the certificate of insurance and the hold harmless
agreement but, rather, it was solely for the benefit of the York-Adams Boy Scouts.
M.S. has, therefore, failed to establish facts to support a finding that they are third
party beneficiaries.

Even though a legal or contractual duty of care on the part of the defendant
may not exist under Pennsylvania law, the court may nonetheless impose liability

on a defendant who assumes a duty of care by his affirmative actions. *See Feld v.*

*Merriam*, 506 Pa. 383, 392, 485 A.2d 742, 746 (1984) (noting that an exception

exists to the general rule precluding the imposition of liability in the absence of a

preexisting duty "where a party assumes a duty, whether gratuitously or for

consideration, and so negligently performs that duty that another suffers damage")

(citing *Pascarella v. Kelley*, 378 Pa. 18, 105 A.2d 70 (1954); *Rehder v. Miller*, 35

Pa. Super. 344 (Pa. Super. Ct. 1908)). The exception is predicated on the

Restatement (2d) Torts § 323 (1965), which has been adopted as an accurate

statement of the law in Pennsylvania and provides:

> One who undertakes, gratuitously or for consideration, to render
> services to another which he should recognize as necessary for the
> protection of the other's person or things, is subject to liability to the
> other for physical harm resulting from his failure to exercise
> reasonable care to perform his undertaking, if
>
> (a)   his failure to exercise such care increases the risk of such
>       harm, or
>
> (b)   the harm is suffered because of the other's reliance upon
>       the undertaking.

*Feld*, 506 Pa. at 392-93, 485 A.2d at 746 (citing *Gradel v. Inouye*, 491 Pa. 534,

421 A.2d 674 (1980); *DeJesus v. Liberty Mut. Ins. Co.*, 423 Pa. 198, 223 A.2d 849

(1966)). A plaintiff will satisfy its burden under Section 323 if it proves one of the

two elements—either increased risk of harm or detrimental reliance. *Feld*, 506 Pa.

at 393 n. 4, 485 A.2d at 746 n. 4 (citations omitted); *see also Evans v. Liberty Mut. Ins. Co.*, 398 F.2d 665, 667 (3d Cir.1968) (applying Pennsylvania law). Moreover, although the Pennsylvania Supreme Court has recognized the exception as stated in Section 323 of the Restatement, it has applied Section 323 narrowly. *Feld*, 506 Pa. at 394, 485 A.2d at 747; *see also Morena v. South Hills Health Sys.*, 501 Pa. 634, 642–44, 462 A.2d 680, 684–85 (1983) (limiting the extent of defendant-paramedics duty under Section 323 to the scope of their undertaking).

M.S. argues that a camper is a foreseeable beneficiary and that the York-Adams Boy Scouts knew or should have known of the reckless acts occurring at Cedar Bridge. M.S. maintains that York-Adams Boy Scouts' failure to require a valid certificate of insurance or hold harmless agreement is part of a larger pattern of ignorance or neglect in failing to require Cedar Bridge's compliance with the lease provision and the Camp's policies. Such a lackadaisical approach permitted circumstances to exist where the alleged injuries to M.S. were more likely to occur.

York-Adams Boy Scouts points out, however, that M.S. has not averred 1) that the insurance certificate or the hold harmless agreement made the camp more appealing; 2) that he was aware the insurance provision or the hold harmless agreement prior to the commencement of this suit; or 3) that the circumstances

compel recognition of M.S.'s right to the benefit of the maintenance-of-insurance provision to effectuate the intentions of the parties to the lease agreement.

M.S. cannot premise the present applicability of §323 on detrimental reliance, given that he had no prior knowledge of either the insurance provision or the hold harmless agreement. Nor can it reasonably be concluded that the risk of harm increased in the absence of valid documents regarding these provisions. First, both Baryla and Weidner testified that they were unaware that Cedar Bridge's insurance had lapsed. Additionally, Berndt and Jeanette Holbrook testified that verbal and physical assault of students had occurred prior to 2007, when both insurance certificate and a hold harmless agreement would have been in effect. Consequently, it cannot be concluded theat the absence of such documents increased the risk of harm. M.S. has not, accordingly, established a duty by the York-Adams Boy Scouts under § 323.

## IV. Recommendation

Based on the foregoing analysis, it is respectfully recommended that the York-Adams Boy Scouts's motion for summary judgment (Doc. 71) be ***granted in part and denied in part.***

26

It is recommended that the court **grant** summary judgment in favor of York-Adams Boy Scouts on M.S.'s negligence claim related to the absence of liability insurance.

It is recommended that the court **deny** summary judgment on M.S.'s claim that York-Adams Boy Scouts was negligent in failing to warn or protect M.S., an invitee, against the tortious acts of Baryla and/or Cedar Bridge.

Signed on June 26, 2012.

---

MILDRED E. METHVIN
U. S. MAGISTRATE JUDGE